Louis L. Gowans and Helen T. Gowans (Husband and Wife) v. Commissioner.
Gowans v. Commissioner
Docket No. 50427.
United States Tax Court
T.C. Memo 1956-133; 1956 Tax Ct. Memo LEXIS 161; 15 T.C.M. (CCH) 672; T.C.M. (RIA) 56133; May 31, 1956
*161 Frank D. Padgett, Esq., for the petitioner. Donald P. Chehock, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Year
Amount
1948
$2,784.52
1949
2,016.86
1950
4,759.92
The primary question presented is whether for each of the taxable years involved the payments received by petitioners under certain written agreements were proceeds from the sale of a capital asset or royalty payments taxable as ordinary income. Alternatively, if the latter, whether petitioners are entitled to depletion deductions and, if the former, whether the gain is taxable in 1945, which year is barred by the statute of limitations. Petitioners claim they are entitled to a refund for the taxable years 1948, 1949, and 1950 in the amounts of $1,656.92, $1,657.22, and $2,827.70, respectively. Findings of Fact The stipulated facts are found accordingly. The petitioners, husband and wife, are and were at all material times herein, citizens of the United States and residents of the city and county of Honolulu, Territory of Hawaii. They filed *162 their joint individual income tax returns for 1948, 1949, and 1950 on the cash basis with the collector of internal revenue for the district of Hawaii. At the beginning of the taxable year 1948 petitioners were the owners of lots 822 and 824, which were adjoining, Makiki Round Top Lots, Honolulu. Lot 824, containing approximately three acres of land, was acquired by petitioners in December 1932. In September 1937 petitioners erected their home on lot 824 and have occupied it continuously since its erection. Lot 822, containing approximately 2.97 acres, was purchased by petitioners at public auction in February 1938 for the sum of $8,150, subject to the Hwaiian Organic Act and Chapter 54, Revised Laws of Hawaii, 1935. The lots were situated on a ridge or hillside, and portions of the lots were so steep as to require extensive grading before they could be improved by buildings. By virtue of quarrying in the area surrounding lots 822 and 824, petitioners were aware that portions of their land contained black sand, a volcanic deposit or material used in the construction of cinder and concrete building blocks. The Honolulu Construction and Draying Company, Limited, hereinafter referred *163 to as Draying Company, is a Hawaiian corporation engaged in business as a general construction contractor and manufacturer of tile. In the fall of 1944 Draying Company approached petitioners with an offer to purchase that portion of lot 824 unessential to petitioners' homesite and the corresponding portion of lot 822, totalling approximately 4.4 acres, each lot being a source of black sand. In preparing the deed of sale it was ascertained that petitioners had not perfected title to lot 822 by erecting a residence upon the premises, as required by law. It was also ascertained that the Hawaiian Organic Act and the statutes of the Territory of Hawaii governing the sale, lease, or disposition of public lands permitted the lots to be used for residential purposes only, and prohibited, without the written consent of the Commissioner of Public Lands and the Governor of the Territory of Hawaii, such land being contracted in any way, directly or indirectly, by process of law or otherwise, conveyed, mortgaged, leased, or otherwise transferred to, or acquired or held by or for the benefit of, any alien or corporation. By a letter dated November 29, 1944, petitioners requested the permission *164 of the Commissioner of Public Lands to assign the lower portion of lot 822, still unimproved, to Draying Company on the condition that a house be constructed thereon or a $2,500 bond be posted. Permission was denied on the ground that under the land patent laws lot 822 was restricted to residential use and commercialization of a portion of the lot could not be permitted in order to erect the required dwelling. Subsequent to November 1944 petitioners and officers of Draying Company conceived a plan by means of which the latter could obtain the black sand which it needed for commercial purposes and petitioners could fulfill their obligations of the 1938 agreement of sale with respect to lot 822, namely, the erection of a dwelling house upon the premises. Draying Company employed Rosewell Towill, an engineer and surveyor, to determine by survey the volume of black sand contained in the lower portions of lots 822 and 824 which it was economically feasible to remove from such sand area, while at the same time leaving the area graded for use as a subdivision. Such subdivision grading was to conform to the requirements of the City Planning Commission, city and county of Honolulu. Towill's *165 survey estimated that there were approximately 250,000 cubic yards of black sand beneath the surface of approximately 192,000 square feet of the so-called sand area, which constituted the minimum amount that would have to be removed in order to grade for the subdivision and to install roadways therein. Towill's survey further estimated that it would cost approximately $32,000 to grade the area conformable to the subdivision requirements after removal of the overburden and the installation of a water pipe line and an access road over the land of an abutting owner. On September 4, 1945, petitioners and Draying Company entered into a written agreement which provided in pertinent part as follows: "THIS AGREEMENT, Made this 4th day of September, 1945, by and between LOUIS L. GOWANS and HELEN T. GOWANS, of Honolulu, City and County of Honolulu, Territory of Hawaii, hereinafter called the 'Seller', and HONOLULU CONSTRUCTION AND DRAYING COMPANY, LIMITED, a Hawaiian corporation, hereinafter called the 'Buyer'. "WITNESSETH: That "WHEREAS the Seller is the owner of or has a certain interest in Lots 822 and 824 of the Makiki Round Top Lots; and "WHEREAS a portion of said two lots comprises *166 an area of approximately 192,000 square feet, hereinafter called the 'Sand Area', as shown on a survey recently prepared by R. Towill; and "WHEREAS, Buyer has estimated that the Sand Area has within it approximately 250,000 cubic yards of black sand which the Buyer wishes to acquire for business purposes; and "WHEREAS, it is feasible and desirable to remove approximately 250,000 cubic yards of black sand from the Sand Area, and with proper grading thereafter to leave the Sand Area in a condition practicable and usable for home building sites, provided a 30-foot roadway can be obtained over and across certain intervening land owned by Fusao Hasegawa and Yoshiko H. Eguchi leading from the said area out to Round Top Drive; and "WHEREAS the Seller is presently negotiating with said Hasegawa and Eguchi for such a 30-foot roadway; and "WHEREAS the Buyer is ready and willing either to buy the interest of the Seller in the land comprising the Sand Area, or to quarry, buy and haul away black sand therefrom, and the Seller is ready and willing to sell same subject to prior consent thereto being given by the Commissioner of Public Lands, upon the terms and conditions hereinafter set forth; *167 "NOW THEREFORE, in consideration of the premises and the agreements hereinafter set forth on the part of the Seller and Buyer to be observed and performed, the Seller and Buyer agree as follows: "The Buyer hereby covenants and agrees to and with the Seller, his heirs and assigns: 1. To procure, at its own expense, a survey plan of subdivision of the Sand Area locating and showing thereon also a 30-foot roadway leading from the Sand Area over and across land owned by said Hasegawa and Eguchi to Round Top Drive; 2. With the consent of the Commissioner of Public Lands first obtained, to purchase all the right, title and interest of the Seller in and to the Sand Area, and to pay the Seller therefor the purchase price of Fifty Cents (50 ) per square foot of land within the Sand Area according to said survey; 3. If the consent of the Commissioner of Public Lands to purchase the said interest of the Seller in and to the sand area cannot be obtained, but if permission to quarry and withdraw black sand from the Sand Area is obtained within a reasonable time after the date hereof, then the Buyer will quarry and haul away from the Sand Area approximately 250,000 cubic yards of black *168 sand and will pay Seller therefor at the rate of Forty Cents (40 ) per cubic yard for all black sand so withdrawn, on the following terms: (a) To pay the Seller on or before the 15th day of each month for all black sand withdrawn during the month prior thereto; (b) To keep accurate books of account and upon request to permit the Seller to examine the same; (c) To save harmless the Seller from all loss, costs, damages, claims or suits of whatsoever nature resulting directly or indirectly from the operation of quarrying and removing black sand; (d) Within five (5) years from the date hereof to quarry and remove approximately 250,000 cubic yards of black sand from the Sand Area;" * * *
Draying Company further agreed that upon removal of the black sand as provided above, it would, before the expiration of five years, complete the grading of the subdivision lots in accordance with plans approved by the City Planning Commission and also grade and pave an access road and install a water pipe line to be available to abutting property owners. In September 1945 preliminary approval for the subdivision and the grading levels was obtained from the Planning Commission. In order *169 to aid petitioners in perfecting their title to lot 822, Draying Company agreed to build a house thereon. Petitioners executed a noninterest-bearing mortgage to Draying Company to secure the transaction. Construction of the house began in January 1946 and on completion in May of the same year a land patent for lot 822 was issued to petitioners. The house cost $19,322.81 to build. Draying Company was reimbursed through credits to petitioners' account as royalties were earned. Payment of the total amount was completed in May 1948. Because of the delay until May 1946 experienced by the petitioners in perfecting their title to lot 822, the corporation was delayed until July 1, 1946, in commencing performance under the 1945 agreement. In the removal of the black sand Draying Company was permitted to take quantities below the grade level where it was of usable quality and to fill the resulting holes to grade level with nonusable material. In August 1947 petitioner executed a note with the Bishop National Bank of Hawaii, promising to pay $70,000 in monthly installments of $1,050 each. In September 1947 petitioners assigned to the Bishop National Bank of Hawaii their rights in the 1945 *170 agreement with the corporation as security for the $70,000 note. Draying Company was willing to make the payments to the bank at such uniform rate since the parties had an oral understanding that production would be kept at an even pace over the five-year period called for by the 1945 agreement. Draying Company requested an extension of the five-year period for removal of the sand from September 4, 1945, to five years from July 1, 1946, when effective removal operations actually began as a result in the delay of petitioners' perfecting title to lot 822. On May 19, 1950, petitioners and Draying Company entered into a written agreement which provided in pertinent part as follows: "THIS AGREEMENT, made this 19th day of May, 1950, by and between HONOLULU CONSTRUCTION AND DRAYING COMPANY, LIMITED, a Hawaiian corporation, of Honolulu, T.H., hereinafter called the 'Buyer', of the first part, LOUIS L. GOWANS and HELEN T. GOWANS, husband and wife, of Honolulu aforesaid, hereinafter called the 'Sellers', of the second part, "WHEREAS, the Buyer and the Sellers made and executed a certain agreement dated September 4, 1945, unrecorded, hereinafter called 'sand agreement', in which agreement *171 the Buyer was given the right and has agreed to take approximately 250,000 cubic yards of black sand from a 4.433 acre area known as the Sand Area being a portion of Lots 822 and 824 of the Makiki Round Top lots, Honolulu, T.H., being also a certain portion of L. P. Grants 11315 and 6815, area 4.433 acres, as more particularly described in a certain mortgage made by the Sellers to Bishop National Bank of Hawaii at Honolulu, dated August 21, 1947, recorded in the Hawaiian Registry of Conveyances in Book 2064, page 116, owned by the Sellers; and "WHEREAS, under said agreement the Buyer is authorized and is hereby authorized to enter upon and to take and remove therefrom Black sand on payment of a royalty of forty cents (40 ) per cubic yard for black sand so removed, and is obligated to construct certain improvements on the said lands after removal of the black sand; and "WHEREAS, the said sand agreement as amended (by unrecorded amendment) provides for removal of the black sand and completion of certain improvements on or before July 1, 1951; and "WHEREAS, it has become essential in the interests of the Buyer's business and necessary to its business program in connection with its *172 use of black sand that the Buyer have an extension of one year within which to exercise its rights, take black sand and to complete construction of the improvements provided for in the said sand agreement; and "WHEREAS, the Buyer still has the right and obligation to remove approximately 133,000 cubic yards of black sand upon royalty payment of forty cents (40 ) per cubic yard; and "WHEREAS, the Sellers desire to obtain a loan from the Bishop National Bank of Hawaii at Honolulu, hereinafter referred to as the 'Bank', in the amount of Forty-Eight Thousand Nine Hundred Sixty Dollars ($48,960.00); and "WHEREAS, the Sellers are willing to grant an extension of one year to enable the Buyer to exercise its rights and perform its obligations under the sand agreement upon the following terms and conditions: "NOW THEREFORE, in consideration of the premises and of ONE DOLLAR ($1.00) each to the other paid, the receipt whereof is hereby acknowledged, and of the terms and agreements on the part of the Buyer and Sellers hereinafter set forth to be observed and performed, the Buyer and the Sellers do hereby mutually agree that the above mentioned sand agreement dated September 4, 1945, be *173 and the same is hereby amended on the following terms and conditions: (a) The time for completion of the provisions of the said sand agreement is hereby further extended for one year from July 1, 1951, to and including July 1, 1952; (b) The Sellers will execute and deliver to the Bank their joint and several promissory note dated May 19, 1950, in the principal amount of $48,960.00 payable on demand after date with interest at the rate of three per cent (3%) per annum payable monthly on diminishing balances of principal, which note shall be endorsed by the Buyer; (c) As further consideration for the one year extension, Buyer agrees to pay the interest on the unpaid balance of principal of said note accruing after the 19th day of May, 1950, and real property taxes attributable to the said 4.433 acre sand area for the period May 1, 1950 to June 30, 1952; (d) Commencing June 20, 1950, all royalty payments for black sand removed from said 4.433 acre sand area are hereby irrevocably assigned to the Bank as security for the repayment of said note and shall be made by the Buyer to the Bank at the rate of $2,040.00 per month and applied by the Bank on principal against the above mentioned *174 note; and upon payment in full of said note all further payments of royalty shall be made to the Sellers; * * *
In order to meet the deadline of July 1, 1952, as set forth in the above agreement, Draying Company, in 1952, rented extra land and stockpiled approximately 100,000 cubic yards of black sand. In 1952 Draying Company finished its operation of removing black sand from petitioners' property. Sand removed and payments made therefor during the years 1947 to 1952, inclusive, are as follows: Year
Cubic Yards
Cash Payments
1947
35,897.47
$ 14,358.98 [1]
1948
30,694.50
15,463.83 [1]
1949
40,356.25
12,600.00
1950
44,692.25
19,126.57 [2]
1951
16$414.50
24,480.00
1952
81,955.03
13,974.62
Total
250,010.00
$100,004.00
The above payments were charged on the books and records of Draying Company to royalty accounts either as prepaid or accrued, dependent upon the amount of black sand actually removed during the period of payment. In its correspondence with *175 petitioners concerning payments Draying Company regularly referred to the payments as royalties. On their income tax returns for 1948 to 1950, inclusive, petitioners reported the respective amounts of $14,653.60, $12,600, and $17,086.57 as long-term capital gain from the sale of a capital asset taxable at the rate of 50 per centum. In determining his deficiency respondent increased the amounts reported and held that the full amounts were taxable as ordinary income. For each of the taxable years 1948, 1949, and 1950 petitioners did not claim and respondent did not allow any amount for depletion of the black sand. During each of the taxable years 1948, 1949, and 1950 petitioners retained an economic interest in the black sand in place contained on their lots. In the taxable years 1948, 1949, and 1950 the petitioners received from their black sand contracts the respective amounts of $16,575.63, $12,600, and $19,867.70, which are taxable as ordinary income. Opinion LEMIRE, Judge: The first question presented is whether for each of the taxable years involved the amounts received by petitioners from Draying Company were taxable as capital gain or as ordinary income. Petitioners *176 contend that under the agreement of September 4, 1945, as amended by the agreement of May 19, 1950, they sold their interest in 250,000 cubic yards of the black sand contained in the so-called sand area of lots 822 and 824 and hence were entitled to treat the proceeds received as capital gain. Respondent contends that petitioners retained an economic interest in the black sand and that the payments for the extraction thereof constituted ordinary income. Since the filing of the briefs herein this Court has rendered an opinion in the case of Crowell Land & Mineral Corp., 25 T.C. 223, on appeal C.A. 5, involving a similar factual situation with respect to sand and gravel. See also, Arthur S. Barker, 24 T.C. 1160, on appeal C.A. 2. We held that the proceeds received under the facts there in controversy were taxable as ordinary income. We are of the opinion that the material facts in the instant case are not distinguishable from the facts in the Crowell case; therefore, that case is controlling here. Accordingly, we sustain the respondent's determination that the proceeds received by petitioners are taxable as ordinary income. Petitioners' alternative contention *177 is that if the proceeds constitute ordinary income they are entitled to a deduction of "statutory" depletion in each of the taxable years. While petitioners assigned as error the failure to allow depletion, although none was claimed on the returns filed, petitioners present no such argument on brief, and they may be deemed to have abandoned such contention. Assuming, however, there has been no intentional abandonment of the issue, we find no merit in the contention. There is no evidence relative to discovery depletion. It was not until 1951 that percentage depletion with respect to sand and gravel was given statutory recognition. Section 319(a) of the Revenue Act of 1951 amended section 114(b)(4) of the Internal Revenue Code of 1939, relating to percentage depletion, so as to include sand and gravel, and by section 319(c) the amendment was made effective as of January 1, 1951. Decision will be entered under Rule 50. Footnotes
1. As received by petitioners: $13,247.18 (1947); $16,575.63 (1948). ↩
2. Commencing June 20, 1950, payments were made by Draying Company pursuant to the agreement of May 19, 1950.↩